**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

JEROME HUDSON                              PLAINTIFF

VS                                         NO. 2:01CV296-EMB

TUNICA COUNTY SHERIFF'S DEPARTMENT
AND SHERIFF JERRY ELLINGTON,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY                                   DEFENDANTS

DEPOSITION OF JERRY L. ELLINGTON

10:00 a.m.
Tuesday, March 12, 2002
Tunica County Courthouse
Tunica, Mississippi

By the plaintiff

APPEARANCES:

FOR THE PLAINTIFF        DEBORAH GODWIN, ESQ.
                         BETSY BARLETT McKINNEY, ESQ.
                         One Memphis Place
                         200 Jefferson Avenue, Ste.
                         Memphis, TN 38103

FOR THE DEFENDANTS       DANIEL J. GRIFFITH, ESQ.
                         P.O. Box 1680
                         Cleveland, MS 38732-1680

Also present            Mr. Jerome Hudson

Reported by:
Yvonne W. Holmes, CSR 1212

**Page 2**

1              JERRY L. ELLINGTON
2  after having been duly sworn by the court reporter,
3  testified as follows:
4              EXAMINATION
5  BY MS. GODWIN:
6     Q  Would you state your full name for the
7  record, please, sir.
8     A  Jerry L. Ellington.
9     Q  Mr. Ellington, I'm Deborah Godwin and I
10 represent Jerome Hudson in an action that's been filed
11 in the Northern District of Mississippi Federal Court.
12 I'm going to be taking your deposition here today.
13        Have you had your deposition taken before,
14 sir?
15    A  Yes, ma'am.
16    Q  So you understand that you're under oath and
17 that the testimony that you give here today may be used
18 in Federal Court.
19    A  Yes, ma'am.
20        MR. GRIFFITH: Counsel, what
21    stipulation do you want to use concerning
22    objections?
23        MS. GODWIN: Standard st[ipulation is]
24    fine.
25    Q  If at any time Mr. Ellington --

**Page 3**

1  understand my question please ask me rephrase it or
2  repeat it. Are you agreeable to doing that, sir?
3     A  Yes, ma'am.
4     Q  And you understand that you need to give
5  audible answers to the --
6     A  I understand, yes, ma'am.
7     Q  What is your current home address, sir?
8     A  P.O. Box 1187, Tunica, Mississippi. That's
9  38676.
10    Q  Is there a street address?
11    A  1070 Jacks Avenue.
12    Q  Are you currently residing at that address,
13 sir?
14    A  No, ma'am.
15    Q  Where are you living now?
16    A  Well, I live at the sheriff's department
17 most of the time, in and out of different hotels.
18    Q  Why are you not living at your residence at
19 the present time?
20    A  We're separated.
21    Q  Are you from the Tunica area?
22    A  Yes, sir. I mean, yes, ma'am. I'm sorry.
23    Q  That's all right. So you grew up here?
24    A  Been here all my life.
25    Q  You went to high school here?

**Page 4**

1     A  Yes, ma'am.
2     Q  Tell me about your education.
3     A  Here in Tunica, I went to high school at
4  Rosa Fort High School and graduated in '97.
5     Q  19--
6     A  1997.
7     Q  1997?
8     A  '77, I'm sorry.
9     Q  I was going to say you can't be that much
10 younger than I am.
11    A  I know that's right.
12    Q  How old are you, sir?
13    A  43.
14    Q  So you're not that much younger than I am.
15    A  No, no, not at all.
16    Q  Did you attend any higher education after
17 high school?
18    A  I went to Northwest Mississippi Junior
19 College after high school.
20    Q  Did you obtain any degree?
21    A  No, ma'am. I did about a year and a half
22 [there].
23    Q  What course of study were you pursuing?
24    A  I was a physical ed major -- in physical ed.

EXHIBIT J

Page 37

brought in, he was sent home with that amount of days.

MR. GRIFFITH: A day per beer.

Q A day per beer?
A Yes, ma'am.
Q Is Zadric Webb your son, sir?
A No, ma'am.
Q He's not?
A No, ma'am.
Q Is he related to you in any way?
A He's my stepson.
Q Is David Ellington a jailer?
A Yes, ma'am. My brother.
Q Was he involved in an accident in which he was charged with driving under the influence?
A Not that I know of.
Q Are you aware of an incident in which Deputy Eugene Payne and William Lewis were involved in an on-duty fight?
A Yes, ma'am.
Q Were they disciplined?
A Yes, ma'am.
Q What discipline did they receive?
A They were sent home, one for ten days and the other one for 60 days, I believe.
Q Why were they not discharged?

Page 38

A Why were they not discharged?
Q Yes, sir.
A Because I chose not to discharge them.
Q What did you base that decision on? Did you feel that they were salvageable employees?
A Yes, ma'am.
Q They were good employees?
A They were definitely good employees.
Q What did they get into a fight over? Do you know?
A Over some heated argument about one or the other person's job duties or something.
Q When we talk about fight, was it physical?
A It was physical, yes, ma'am.
Q Was either one injured?
A No, ma'am. A little grabbing and choking around the neck, I think. That was about it.
Q What about Deputy Patricia Marshall getting into a fight with a civilian, Javetta Siggers?
A What about it?
Q Are you aware of that incident?
A Yeah.
Q And Deputy Marshall was on duty at the time?
A No, ma'am.
Q But you are aware of that incident?

Page 39

1  A Yes, ma'am.
2  Q Did she receive discipline as a result of
3 that?
4  A No, ma'am. Not as of yet. There has been
5 no complaint filed against her.
6  Q But you're aware that it occurred?
7  A I heard it was supposed to have occurred,
8 yes, ma'am. But until there's a complaint filed,
9 there's nothing I can do.
10  Q You had a dispatcher named -- her last name
11 is Dunn; is that right?
12  A Yes, ma'am. Cheatham now.
13  Q I'm sorry?
14  A Her last name is Cheatham.
15  Q Her last name is Cheatham?
16  A Um-hum.
17  Q What's her first name? Donna? Is that
18 right?
19  A Donna, yes, ma'am.
20  Q And was she recently fired?
21  A Yes, ma'am.
22  Q What was she fired for?
23  A Insubordination and disrespect.
24  Q Who was she insubordinate to?
25  A The sheriff.

Page 40

1  Q And that is yourself?
2  A Yes, ma'am.
3  Q What is it that she did?
4  A She refused to leave my office when I told
5 her to leave.
6  Q Had she received any discipline prior to
7 that?
8  A I'm sure she had of some type, yes, ma'am.
9  Q What factors do you consider in deciding
10 what level of discipline you are going to apply?
11  A I consider a lot of factors when I'm trying
12 to inflict discipline on personnel: the effect it has
13 on the community and overall is what effect it has on
14 the department, the department as a whole.
15     I have to take all that into consideration
16 because I don't believe in firing them because
17 everybody need their job. That's a last resort for me.
18 If I fire somebody, then that's an extreme, usually.
19  Q Well, obviously, you fired Lieutenant
20 Hudson. Why did you fire him as opposed to issuing
21 some lesser form of discipline?
22  A Because falsification of records is a
23 serious offense and it's kind of hard to rectify that.
24 And I don't see how I can pull that back and say, "You
25 go back and change that and do it another way." He may

Page 41

1 go back and be dishonest again.
2    Q  What is the purpose -- your understanding of
3 the purpose of discipline?
4    A  My understanding of the purpose of
5 discipline is to -- sometimes to help that person get
6 in line with his shortcomings or, like I say, if it
7 calls for a degree of termination, then you have to do
8 that.
9    Q  Do you consider it to be punitive or
10 corrective or both?
11   A  Discipline itself?
12   Q  Yes, sir.
13   A  I don't know how to answer that one because
14 I don't know what kind of answer you're looking for
15 really.
16   Q  Well, when you issue progressive discipline,
17 is part of your rationale for doing that that you are
18 trying to rehabilitate or correct the behavior so that
19 it doesn't happen again?
20   A  That's usually the idea, yes, ma'am.
21   Q  I mean, if two deputies are engaged in a
22 physical fight, you had the authority to fire them, did
23 you not?
24   A  Yes, ma'am.
25   Q  But you felt that it was reasonable to give

Page 42

1 them another chance.
2    A  Yes, ma'am.
3    Q  But you didn't feel it was reasonable or
4 there was any corrective action you could have taken
5 with Lieutenant Hudson short of discharge?
6    A  No, ma'am.
7    Q  And that's the case, even though you've
8 indicated that he was such a good employee.
9    A  Certainly.  That's the case with most
10 officers I terminate.  They're good officers.  Tony
11 Herring was a great officer.  I take nothing away from
12 him.  Bridges is a model officer, and I certainly
13 couldn't have taken nothing away from him.  Done a
14 great job.
15   Q  Let me hand you a copy of the October 30,
16 2000 memo from Lieutenant Jerome Hudson to Lieutenant
17 W.C. Eskridge, jail administrator.
18      My understanding is that this is the
19 document that you have indicated that you base the
20 discharge of Jerome Hudson on; is that correct, sir?
21   A  Yes, ma'am.
22   Q  Is that the document that you contend that
23 Jerome Hudson falsified?
24   A  Yes, ma'am.
25   Q  Is there any other document that you

Page 43

1 contended that Jerome Hudson falsified at that time, at
2 the time you decided to discharge him?
3    A  That's the one there, yes.
4    Q  This is the only document that you based
5 your decision on, sir?
6       MR. GRIFFITH:  I'm going to object to
7    the form.
8    A  That was it.
9    Q  Let me rephrase that.
10      MR. GRIFFITH:  Do you understand what
11   she's asking you?  Is that single piece of
12   paper the only document that --
13      THE WITNESS:  I understand.
14      MR. GRIFFITH:  -- you based your
15   decision on?
16      THE WITNESS:  Yes, sir, that's it.
17      MR. GRIFFITH:  That's what she's asking
18   you.
19      THE WITNESS:  That's all.
20   Q  When did you first see this memorandum?
21   A  Somewheres in late November, I think, or
22 early December of 2000.
23   Q  The document is dated October 30, 2000?
24   A  I see that.
25   Q  It is to the jail administrator, Lieutenant

Page 44

1 W.C. Eskridge --
2    A  Yes, ma'am.
3    Q  -- that you were shown as copied.
4    A  I see it.
5    Q  Did you not receive a copy of this document
6 at the time, on or about October 30, 2000?
7    A  No, ma'am.
8    Q  Are you saying you didn't receive it at that
9 time or you don't know whether you did?
10   A  I didn't receive it at that time.
11   Q  Jerome Hudson didn't hand you a copy of it?
12   A  No, ma'am.
13   Q  So what is your recollection of the first
14 time you saw this document and how you came to see it?
15   A  I got a copy from the jail.
16   Q  What do you mean you got a copy from the
17 jail?
18   A  They brought me a copy from the jail.
19 That's the only -- the first I got a recognition of
20 this information was, like I said, the last of November
21 or first of December in that year.
22   Q  Of 2000.
23   A  Yes, ma'am.
24   Q  Who brought it to your attention?
25   A  The jail administrator, Eskridge, I believe

Page 45

1   Q  And what did he say to you about it?
2   A  He just said that "This was a document that
3 Hudson brought back here for review."
4   Q  And what was your response?
5   A  I said, "Okay. Thank you."
6   Q  At that time, did you have a problem with
7 it?
8   A  No, ma'am.
9   Q  Did you look at it?
10  A  Once I got it, I just looked at it and put
11 it on my desk at that moment.
12      MS. GODWIN: Let's go on and make this
13 Exhibit 3, I guess.
14      (MEMORANDUM DATED OCTOBER 10, 2000, FROM
15 JEROME HUDSON TO W.C. ESKRIDGE, JAIL
16 ADMINISTRATOR, MARKED EXHIBIT 3.)
17 MS. GODWIN CONTINUED:
18  Q  Did Lieutenant Eskridge, the jail
19 administrator, indicate to you there was any problem
20 with this document at the time that he gave it to you?
21  A  No, uh-uh, not at first.
22  Q  This document refers to a Rubby Gooden.
23 Were you at that time familiar with who Rubby Gooden
24 was?
25  A  Yes, ma'am.

Page 46

Q  And who did you know her to be?
A  An inmate in the jail on a narcotics charge.
Q  Did you also understand her to be a witness
in any pending cases?
A  Yes, ma'am.
Q  What case was pending at the time that you
believed her to be a witness in?
A  I think it was Willie Hampton, I believe,
and the Bowens case. I believe that's what case she
was a witness in.
Q  Tell me a little bit about the Hampton/Bowen
case, what that was about.
A  The Hampton was a case that narcotics worked
on here and discovered that he had a large amount of
drugs that was confiscated in town. The value of those
drugs was somewhere around a million and a half, I
guess, which was a great big case for Tunica County.
     And they worked on that, and I guess somehow
they used her to supposedly buy some drugs from him at
a residence in the north subdivision. They bought some
drugs off of him there, and they arrested him at the
house.
  Q  Was Lieutenant Hudson involved in that case?
  A  Yes, ma'am.
  Q  What was his involvement, to your knowledge?

Page 47

1   A  I think he was the lead investigator on the
2 case.
3   Q  And what, if any, other agencies were
4 involved in that case?
5   A  MBN. And I think FBI may have been involved
6 in it somewhere along the way.
7   Q  MBN being the Mississippi Bureau --
8   A  Mississippi Bureau of Narcotics.
9   Q  -- of Narcotics? So you were aware at the
10 time that Lieutenant Hudson was working with state and
11 federal agencies in pursuing the case against Hampton
12 and Bowen; is that right?
13  A  I knew about Hampton at the time. The Bowen
14 case came up later or something. But, yes, I was
15 familiar with the Hampton case.
16  Q  And these individuals were charged
17 federally, were they not?
18  A  Yes, ma'am.
19  Q  And you were aware of that?
20  A  Yes, ma'am.
21  Q  Was there some jealousy or indication from
22 the state that they would have preferred that those
23 charges had been brought to the state rather than the
24 federal government?
25  A  That's always the case, I think. Yeah, I

Page 48

1 think that certainly had a bearing on this. From my
2 understanding, the DA wanted to try to ask the question
3 as to why it was not brought to them, but I don't know.
4   Q  You knew that Rubby Gooden was in the Tunica
5 County jail, correct?
6   A  Yes, ma'am.
7   Q  And you knew that Rubby Gooden -- her
8 identity was not being concealed, did you not?
9   A  Yes, ma'am.
10  Q  When did you first come to the conclusion
11 that there was something false about this document?
12  A  I guess it was about a week after it was
13 brought to my office and I looked at it, and I -- the
14 question in my mind was, a Federal Witness Protection
15 Program on my letterhead, how in the world is this
16 possible and me, being sheriff, not even knowing
17 anything about this program. This can't be. How in
18 the world can this be in this jail and I'm the sheriff
19 and don't know there's a Federal Witness Protection
20 Program here. There's something wrong with this.
21      So I started contacting people from there as
22 to who was authorizing this to go on inside of Tunica
23 County.
24  Q  And who did you contact?
25  A  Chad Lamar at the attorney general's office

HUDSON V. TUNICA COUNTY        C&I Basic™                JERRY ELLINGTON

Page 49

1  in Oxford. To verify whether or not they knew anything
2  about a Federal Witness Protection Program.
3      Q  And what did --
4      A  His response was, "Yeah, we know something
5  about a Federal Witness Protection Program. But if we
6  were going to do one, Sheriff, we'd have that person
7  over here or somewhere, not in your jail."
8      I said, "Well, something has to happen here,
9  Chad, because this person is being held in the jail
10 and it's going to get us in some legalities if we don't
11 do something with her without some kind of paperwork
12 from y'all saying that she's under the Federal Witness
13 Protection Program. Not my paper, because I've got
14 some document here on my desk saying we've got her
15 under the Federal Witness Protection -- well, Federal
16 Witness Program, and I don't even have one. So you
17 tell me what I need to do."
18     Q  What did he tell you you needed to do?
19     A  "Well, Sheriff, we're going to get back with
20 you. It's growing close to the holidays now, and we'll
21 get back with you after the first of the year."
22     I said, "This person is going to be in jail
23 until the first of the year? So that's more days I'm
24 holding her without any -- something has to happen."
25     So after he left the person, they came

Page 50

1  back and said that they was taking her to trial or
2  something for her testimony. Then after that, I think
3  they got rid of her. Somehow they was through with her
4  or something. We turned her loose.
5      Q  This memorandum appears to copy yourself, as
6  well as a number of other persons and entities,
7  including the FBI and the U.S. attorney's office and
8  the Mississippi Bureau of Narcotics.
9      A  Right.
10     Q  Do you see that?
11     A  Yes, ma'am.
12     Q  So when you talked to Mr. Lamar, was he
13 aware of this?
14     A  He said he didn't know anything about it.
15     Q  He said he didn't know anything about it?
16     A  That's what he said.
17     Q  Did he indicate to you that he had a problem
18 with it?
19     A  No, ma'am.
20     Q  Did you send him a copy of it?
21     A  No, ma'am. All I asked him was what was the
22 procedure for having a person under the Federal Witness
23 Program?
24     Q  And what did he tell you?
25     A  "If we were going to get a person under a

Page 51

1  Federal Witness Protection Program or Witness Program,
2  we would have that person here or we would send you
3  some documentation on where to house that person,
4  Sheriff." I said, "I would think so."
5      This ain't it.
6      Q  Did he tell you she was a federal witness?
7      A  Oh, yeah.
8      Q  So you knew she was a federal witness.
9      A  Certainly.
10     Q  And you've interchanged in your testimony
11 the terms Federal Witness Program and Federal Witness
12 Protection Program.
13     A  Certainly.
14     Q  You know that there is a formal Federal
15 Witness Protection Program, correct?
16     A  Sure.
17     Q  And he indicated to you that in order to get
18 someone into that program, you've got to go through --
19     A  The federal --
20     Q  -- a big protocol --
21     A  Right.
22     Q  -- through the marshal's office, right?
23     A  Yes, ma'am.
24     Q  And you knew that this wasn't it.
25     A  Yes, ma'am.

Page 52

1      Q  Did you go at that time to Lieutenant Hudson
2  and ask him about this?
3      A  I don't think so. Not at that time.
4      Q  Did you go to him at any time prior to the
5  date that you discharged him and ask him about this
6  memo?
7      A  I don't think so.
8      Q  What else other than talking to Lamar -- is
9  that his name?
10     A  Yeah, Chad Lamar.
11     Q  Chad Lamar, who's an assistant U.S.
12 attorney; is that correct?
13     A  Yes, ma'am.
14     Q  What else did you do to investigate this
15 matter other than talking to him?
16     A  I talked to the jail personnel and asked
17 what the process was with Rubby Gooden and how she was
18 being handled and what kind of documentation were they
19 receiving on her when they come and transfer her out.
20 None of it added up to me.
21     Q  When you say none of it added up, what do
22 you mean, sir?
23     A  I mean, like I said, when people come get
24 people out of jail for other agencies, usually they
25 have some kind of

Page 53

1 subpoena or something that's an official document to
2 say that they're going to get this person and carry
3 them somewhere. None of that took place.
4     That's some of the stuff that aroused my
5 suspicion about her, you know, along with the
6 documentation itself and talking with Chad Lamar.
7  Q  So you talked to the jail personnel.
8  A  Yes, ma'am.
9  Q  What else did you do, if anything?
10 A  That's about it.
11 Q  That's it?
12 A  Yes, ma'am.
13 Q  So you never asked Lieutenant Hudson about
it.
14 A  I don't recall.
15 Q  You don't recall asking him anything about
that.
16 A  No, ma'am.
17 Q  Did Lieutenant Hudson have a secretary?
18 A  Yes, ma'am.
19 Q  Who was his secretary?
20 A  Sharon Johnson.
21 Q  And who typed memos for Lieutenant Hudson?
22 A  I don't know.
23 Q  Did she perform typing for him?

Page 54

1  A  Sometimes.
2  Q  Did you go to her and ask her about it?
3  A  No, ma'am.
4  Q  Hadn't Lieutenant Hudson come to you before
October 30, 2000, and discussed with you the fact that
he was concerned about threats being made to both Rubby
Gooden and himself concerning their involvement in the
Hampton and Bowen cases?
5  A  I don't recall that.
6  Q  You indicated that you recall seeing this
memo sometime in November, is that right?
7  A  Right.
8  Q  And then you fired Lieutenant Hudson when?
9  A  After the case was over in February, I
think, of the following year.
10 Q  So you waited until after --
11 A  The Hampton case.
12 Q  -- Hampton and Bowen were convicted; is that
right?
13 A  Yes, ma'am.
14 Q  And why is that, Sheriff?
15 A  Didn't want to cause any interference in the
case or disruption in the case by terminating the guy
that was supposedly head of the investigation.
16 Q  Do you recall when the trial of Hampton and

Page 55

1 Bowen was conducted?
2  A  I think it was the first of the year, around
3 January or something, I think.
4  Q  I'll hand you just for the record what
5 appears to be a newspaper article -- part of the date
6 is cut off, but I think it's February 8th of 2000 --
7 indicating that Hampton and Bowen were convicted on
8 drug charges.
9     Do you recall seeing that?
10 A  No.
11 Q  Does that sound about right to you?
12    MR. GRIFFITH: Object to the form.
13 A  I don't remember ever seeing it. I don't
14 even know where that's from.
15 Q  Well, you do know they were convicted,
16 correct?
17 A  Yes, ma'am.
18 Q  Sometime in February of 2000.
19 A  I think -- yeah, I think Hudson told me they
20 got a conviction.
21 Q  Hudson told you?
22 A  I think so.
23 Q  It wasn't in the newspapers?
24 A  I don't know, I don't recall seeing it in
25 the paper.

Page 56

1  Q  I hand you a copy of an article that you
2 might have some better recollection in that it appears
3 to have your picture in it.
4  A  Oh, yeah.
5  Q  Do you remember that one?
6  A  Yes, ma'am, I remember that one.
7  Q  That was at, I believe, the time of the bust
8 in March of 2000; is that right?
9  A  Right.
10    MS. GODWIN: Let's make that Exhibit 4,
11    please.
12    (NEWSPAPER ARTICLE DATED MARCH 23, 2000,
13    FROM THE TUNICA TIMES MARKED EXHIBIT 4.)
14 MS. GODWIN CONTINUED:
15 Q  Do you recall in April of 2000 Jerome Hudson
16 coming to you to talk about the Willie Hampton and
17 Arthur Bowen drug cases and advising you that someone
18 was trying to set him up and get him killed for his
19 involvement?
20 A  No.
21 Q  You don't recall --
22 A  No, ma'am.
23 Q  -- anything about that at all?
24 A  No, ma'am.
25 Q  You don't recall telling him, responding to

Page 73

1 other agencies was involved in. I'm going to be held
2 liable, so all I'm saying is I have a right to know
3 what people that work for me are doing, going to be
4 responsible for. That's all. I don't care who they
5 investigate, what time you come in, what time you're
6 going to get -- I don't really care about that. I just
7 -- just so we can have an efficient operation, let me
8 know. That's all I told him.
9     Q  Were you under the impression that they were
10 investigating you?
11    A  So it seemed. I mean, why -- otherwise, why
12 would you not inform the sheriff of what you're doing
13 unless you don't want me to know or I'm going to tell
14 somebody. I can understand the previous problem, and I
15 told them when they came there the same thing. "The
16 previous problem you had with the other administration,
17 I'm not that other administration. I have never
18 interfered with nobody trying to do no work as far as
19 the sheriff's department is concerned, drugs
20 especially." I hate drug folks. I don't like them.
21 Granted, I married one, but, you know, that's a
22 different issue. Folks that sell drugs, to me, is a
23 problem for any community, and I wanted to see them rid
24 of it. I want to get rid of them if there's any way
25 possible. We can dump them all up in the ocean, but,

Page 74

1 you know, that ain't realistic.
2     But I have a problem with folks that commit
3 crimes. I don't condone that. Nobody can tell you
4 nowhere that I have ever tried to cover up for no
5 corruption or nobody at no given time. I don't work
6 like that. That's what I was trying to relate to them
7 when they came. I said, "I want to work with you. I
8 don't want to work against you because there's going to
9 come a time when I need your help and there's going to
10 come a time when you're going to need mine."
11    If we can't work together as law enforcement
12 agencies, man, it's going to be a problem for folks.
13 The crime folks are going to get away with everything.
14    But that's basically my reasoning for
15 putting out the letter, you know, for efficiency as far
16 as the agency is concerned.
17    Q  Did any representatives of the FBI ever
18 indicate to you that they liked the way that they
19 worked with Jerome Hudson?
20    A  They ain't indicated that to me, no, because
21 they were too busy telling me they weren't going to
22 work with me.
23    Q  With you.
24    A  Yeah.
25    Q  But you knew they were working with Jerome

Page 75

1 Hudson.
2    A  I didn't know what they were doing with
3 Jerome Hudson. Jerome Hudson didn't let me know what
4 they were doing either. So I had no way of knowing
5 what they were doing.
6    Q  But you knew he was working with them on the
7 Bowen/Hampton matter, correct?
8       MR. GRIFFITH: Objection. That
9    improperly characterizes the prior
10   testimony. I think, for the record, the
11   Hampton case is a Tunica case. You'll have
12   to take that up with --
13      THE WITNESS: True.
14      MR. GRIFFITH: Prosecuted by federal
15   authorities, but actually I think it is, to
16   his credit, Jerome Hudson's case.
17      THE WITNESS: That's true.
18   Q  What money was used to purchase the drugs in
19 the Hampton case? It wasn't Tunica money, was it?
20   A  I don't know.
21   Q  You don't know?
22   A  No, ma'am, I don't know. I don't even know
23 if that took place under my administration or not.
24   Q  I hand you a memo dated February 20, 2001,
25 from Jerome Hudson to you and ask if you can identify

Page 76

1 that.
2       MR. GRIFFITH: Do you have a signed
3    copy?
4       MS. GODWIN: I don't believe that I do,
5    no.
6       MR. GRIFFITH: It's got a place on
7    there for a notary. It doesn't have a
8    signature line.
9       MS. GODWIN: Let me make sure. It's
10   initialed on the front.
11      MR. GRIFFITH: I think that's what I'm
12   asking. It has a place for a notary on
13   there. Is it a copy?
14      MS. GODWIN: Let me have that back for
15   a second. Let me make sure these go
16   together.
17      MR. HUDSON: They do.
18      MS. GODWIN: It wasn't anything that
19   needed to be notarized. I don't know why
20   that was on there unless it was some kind of
21   form or something. But that's the document
22   that's initialed by Jerome Hudson.
23   A  I don't recall receiving one of these.
24   Q  You don't recall receiving that?
25   A  No, ma'am.